IN THE CHANCERY COURT OF HANCOCK COUNTY, MISSISSIPPI

KEN E. BLANCHARD                                                              PLAINTIFF

V.                                                            CAUSE NO. 17-cv-09-JS

ALAMO MECHANICAL, LLC AND
KEITH J. LADNER and JOHN DOES 1-9                                        DEFENDANTS

ORDER OF CONTEMPT AND ENTRY OF DEFAULT JUDGMENT

THIS CAUSE came on for hearing as scheduled by the Court (Dkt 100) on August 28-29, 2018, and carried over to August 30, 2018.  At that time, the Court heard the Plaintiff Ken E. Blanchard's ("Plaintiff" or "Blanchard") motion for contempt, sanctions and to compel (Dkt 50) against Defendant Keith J. Ladner ("Defendant" or "Ladner") (Alamo Mechanical, LLC is also referred to as "the LLC"). As a result of the findings and conclusions entered herein as to that motion, Blanchard's motion for protective order (Dkt 67) is not reached and Defendant's motions (Dkt 75; Dkt 76; and Dkt 99) are not reached and/or are rendered moot.

The parties appeared in person and with their respective counsel, and the Court, having reviewed the pleadings, hearing the argument and testimony presented, and being fully advised in the premises, issued its bench ruling GRANTING Plaintiff's Motion for Contempt, Sanctions and to Compel, specifically finding Defendant Ladner to be in civil contempt of this Court; ordering a freeze of Alamo Mechanical, LLC's assets *and* Defendant Ladner's personal assets up to One Million Dollars ($1,000,000.00) until Ladner posts an equivalent bond securing the judgment in this matter; judicially dissolving Alamo Mechanical, LLC; and entering sanctions against Ladner, all as set forth in the Findings of Fact and Conclusions of Law herein.  The Court therefore FINDS, ORDERS, and ADJUDGES as follows:

1.     Blanchard filed the complaint and petition for injunctive relief (Docs 2-3) in this matter on March 29, and 31, 2017 and on the same date the Court entered its Temporary Restraining Order requiring Ladner and his agents to be "restrained from taking any further action toward seizing control of the [LLC] and/or moving, changing or dissipating any assets of the parties..." (Doc 4)

2.     Ladner's pleadings repeatedly denied the fact of Blanchard's membership and all other material facts alleged by Plaintiff's complaint and petition. (Docs 17, 18) He again denied Blanchard's membership in the LLC and refused to produce relevant discovery in responses to requests for admissions, document requests and interrogatories dated May 17, 2017. (Doc 50-1)

3.     Plaintiff's petition for injunctive relief was heard on April 18, 2017 and on May 1, 2017, this Court entered its order requiring Ladner to provide the Court with a "complete and comprehensive set of business and financial records with supporting documentation as contemplated by Mississippi Code Section 79-29-308[1]." (Doc 23) Ladner failed to comply with this directive as shown below.

4.     Ladner's May 17, 2017 discovery responses (Dkt 50-1) were made while Ladner was subject to the Court's May 1, 2017 order (Doc 23) requiring him to provide all company

---

[1] The applicable statute describes the information and documents Ladner was ordered to produce to the Court:
"... (a) True, full and current information regarding the status of the business and financial condition of the ... company; (b) ... a copy of the ... company's federal, state and local income tax returns for each year; (c) A current list of the name and last known ... address of each member and manager; (d) A copy of any written operating agreement and certificate of formation and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which the operating agreement ... certificate and all amendments ... have been executed; (e) True and full information regarding the amount of cash and a description and statement of the ... value of ... other property or services contributed by each member ... and the date on which each became a member; and (f) Other information regarding the affairs of the ... company as is just and reasonable." Miss. Code. Ann. § 79-29-315.

records to the Court, under seal; and also restraining "Ladner... or any agent thereof" "from taking any further action toward seizing control of the [LLC] and/or moving or changing or dissipating any assets of the parties..." (Doc 23)

5.      On May 8, 2017, Blanchard moved for access to the LLC's company records because Ladner failed to provide them to the Court as ordered and because Blanchard believed that Ladner's ongoing actions were causing additional harm to the LLC and Blanchard. (Doc 24) At the July 19, 2017 hearing on this motion, the Court determined, inter alia, that Ladner had produced only partial or incomplete documents he had been ordered on May 1, 2017 to provide to the court. (7/19/2017 Tr. pp 10/16-11/19) (Doc 50-2)

6.      The July 19, 2017 hearing resulted in the Court's September 12, 2017 Order, *nunc pro tunc* to July 19, 2017, finding and concluding that "Blanchard owns a membership interest in [the] LLC" and "he is a member" and that Blanchard is "entitled to review all of Alamo Mechanical, LLC's company records, assets and other items, without limitation, to include a complete and comprehensive set of business and financial records with supporting documentation, per Mississippi Code Section 79-29-308 [now 315]; all items previously filed by Defendants pursuant to the Court's prior order; and all newly created or ongoing documents or items related to Alamo Mechanical, LLC." (Doc 41)

7.      The Court also ordered that the "parties and their counsel shall cooperate to make all such documents and items available for Plaintiff's and his expert's review throughout the pendency of this litigation"; and, further ordered maintaining the temporary restraining order "to the extent that the parties and their agents or employees shall continue to be restrained from secreting, encumbering, wasting, damaging or disposing of any Alamo Mechanical, LLC property (real, personal or intangible), regardless of title or possession, including any and all

company or company-related document, or things." (Dkt 41) Finally, the Order explicitly made its directives "enforceable through contempt of Court." *Id.*

8.    Thereafter, Plaintiff, through counsel, requested access to LLC records and information, and also requested corrected and supplemental responses to Plaintiff's written discovery, as well as on-site examination of LLC records by Plaintiff's expert forensic accountant, by way of several letters beginning January 30, 2018. (Dkt 50-6; 50-7; 50-8)

9.    Plaintiff moved for contempt, sanctions and to compel compliance with the Court's previous orders (Dkt 50) on February 20, 2018, giving Defendant Ladner notice that Plaintiff was seeking the most severe sanctions available against Defendant Ladner, individually, along with multiple additional sanctions and orders; and, that Plaintiff was asking the Court to first consider and determine that lesser sanctions alone will not suffice. (*Id.*) In addition to failure to produce discovery as ordered, Plaintiff's motion asserted that Ladner altered company documents "Quick Books" ("QB") spread sheets. (*Id.* and see Dkt 50-10) These spread sheets show that life insurance premiums were first entered into QB by Ladner or his staff throughout 2014 and 2015 as "insurance expense". They were later changed to reflect that the payments for 2014-2016 were "distribution[s]" to Ladner, as opposed to company "insurance expense[s]", thereby concealing that the LLC paid the premiums and attempting to conceal evidence supporting Plaintiff's claim that Ladner had given Blanchard an ownership interest in the policy. At that time, this Court had two orders in place specifically directing the parties not to change any of their assets. (Dkt 4; 23)

10.    Plaintiff's motion for contempt and sanctions also asserted that he was entitled to discover the whereabouts of all LLC assets, including the proceeds of an insurance policy on the life of Steven Ladner (deceased former business partner of Defendant Ladner, but no relation),

because Ladner's acts, as of that motion filing date "indicate a high likelihood that he has transferred LLC assets into the possession, bank accounts and/or title of one or more of his relatives and close associates. Plaintiff requested all records necessary to locate these assets, including the joint ownership of any bank account or other asset by Ladner with any of these persons. In the alternative, Plaintiff petitioned for Ladner to post cash into the Court's registry in an amount exceeding the life insurance proceeds total (over $2M), so as to sufficiently protect Plaintiff's 1/2 interest in the total value of all LLC assets (known to include bank accounts, construction equipment, tools and insurance proceeds)." (Dkt 50) The insurance proceeds at issue were disbursed on a claim for the policy whose premiums were paid by the LLC, with the payments changed in QuickBooks, as referenced above.

11.    As a matter of law, the Court is required to consider lesser, non-dispositive sanctions, but the Court is authorized by its inherent authority and by the jurisprudence of our state to enter such sanctions "[w]hen faced with ... egregious misconduct" such as Ladner's conduct in this case; and, when lesser sanctions will not suffice, "courts are obligated to consider sanctions that are severe enough to deter others from pursuing similar courses of action." *Illinois Cent. Gulf R. Co. v. McLain*, 174 So. 3d 1279, 1285, (Miss. 2015) (citations omitted). "Our trial judges are likewise in a much better position to decide which parties and/or lawyers need to be sanctioned for their behavior, and our trial judges should unhesitatingly exercise this inherent power and authority." *Id*, 174 So. 3d at 1291 (quoting *Mississippi Farm Bureau Mut. Ins. Co. v. Parker*, 921 So. 2d 260, 265 (Miss. 2005)).

12.    This Court's authority to enter such sanctions for discovery violations is also provided by Mississippi Rule of Civil Procedure 37. The rule empowers trial courts with the discretionary authority to "impose upon any party or counsel such sanctions as may be just."

M.R.C.P. 37; and our Supreme Court has found that those justified sanctions may include the "death penalty" of a civil action–dismissal with prejudice–"when the deterrent value of Rule 37 cannot be achieved by the use of less drastic sanctions." *May v. Austin by & through Austin*, 240 So. 3d 389, 393 (Miss. 2018) (citations omitted). In this matter, striking Ladner's pleadings, entering default judgment against him on the issues of liability, and limiting remaining issues and evidence to be allowed at trial are equivalent to the dismissal discussed in *May v. Austin, supra*.

13.     In *Cooper Tire & Rubber Co. v. McGill*, 890 So. 2d 859, 865 (Miss. 2004), our Supreme Court listed examples of justified sanctions which may be entered by a trial court for violations of its discovery-related orders, including:

> (A) an order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;
> (B) an order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence;
> (C) an order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;
> (D) in lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders.

14.     The Court adopted four factors to determine whether the most severe sanctions, such as striking pleadings and rendering a default judgment are justified: (1) "failure to comply with the court's order results from wilfulness or bad faith, and not from the inability to comply"; (2) "situations where the deterrent value of Rule 37 cannot be substantially achieved by the use of less drastic sanctions"; (3) "whether the other party's preparation for trial was substantially prejudiced"; and (4) when failure to comply with the Court's orders is due to the acts of the party, and not "plainly attributable to an attorney rather than a blameless client, or ... grounded in

confusion or sincere misunderstanding of the court's orders." *Illinois Cent. Gulf R. Co. v. McLain*, 174 So. 3d at 1285 (citations omitted).

15.     The evidence presented in this case establishes each of the four *McLain* factors and justifies the most severe sanctions against Defendant Ladner, individually.

16.     *As to the first and fourth factors*, throughout this litigation Ladner has made false statements of fact to the Court and counsel and he has alternated between refusing to admit that he has been untruthful and admitting his untruthfulness only when he is confronted with clear, convincing and prima facie evidence that his statements were false or inherently misleading.

17.     There was no evidence that Ladner lacked understanding regarding false representations or that he was unable to make required disclosures and discovery relative to correcting his false and misleading representations of fact. See, *McLain, supra*. 174 So. 3d at 1285 ("We have seen nothing of any inability to comply with this Court's discovery-related orders: [the party] only admitted that she had been untruthful in her responses to discovery when she realized that defense knew the truth and confronted her with it. We hold that the above facts constitute clear willfulness and bad faith[.]")

18.     Further, the Court finds that Ladner intentionally defied this Court's several orders (Dkt 4, 23 and 41), and he engaged in willful, purposeful, and intentional bad faith by repeatedly withholding documents and information to which Plaintiff is entitled and by making false statements of fact to the Court and counsel, before and after Plaintiff's membership was determined in the Court's order (Dkt 41); and that he did so before and after other facts were proved by clear and convincing *prima facie* evidence of company records Ladner himself created or offered in evidence (discussed further below).

19.     "A corporation speaks and acts through its records... *[C]orporate records and*

*minutes constitute the best evidence of corporate action." His Way, Inc. v. McMillin,* 909 So. 2d 738, 745 (Miss. Ct. App. 2005) (emphasis in original) (citations omitted). "If corporate records ... are available, parol evidence is not admissible to prove the corporation action, personal knowledge of corporate action is always admissible." *Id.* "A person commits an offense if he signs a document he knows is false in any material respect with intent that the document be delivered to the Secretary of State for filing." Miss. Code. Ann. § 79-37-118. "An offense under this section is a misdemeanor[.]" *Id.*

20.     The complete picture of Ladner's contemptible acts and bad faith are too numerous for this order, but characteristic examples of Ladner's intentional defiance of the Court's orders and his intentional bad faith, through false and misleading representations of fact, are listed as applicable to the second *McLain* factor, below.

21.     *As to the second McLain factor*, the Court finds that lesser, non-dispositive sanctions alone will not deter other litigants in future cases from engaging in behavior similar to Ladner's, and such lesser sanctions alone will also not deter Ladner himself from continuing to intentionally defy this Court's orders and to engage in continuing bad faith by way of false and misleading statements to the Plaintiff and to this Court during the balance of this litigation, because Ladner's reprehensible behavior has continued throughout this litigation.

22.     The Court further finds that lesser sanctions would effectively allow Ladner to benefit from his actions in this case and would signal their effectiveness to litigants in future cases.

Examples supporting McLain factors (1) and (2) follow:

(a)     Ladner filed his Answers to the Complaint and Petition on April 18, 2017. (Dkt 17 and 18) In these pleadings, Ladner denied Plaintiff's membership in the LLC, despite *prima facie* proof of said membership, in the form of LLC company records that Ladner himself signed and filed with the Mississippi Secretary of

State one month prior to his pleadings, on March 20, 2017. (Dkt 17 Answer to Complaint ¶¶ 1, 4, 18) (Dkt 18, Answer to Petition ¶ 1) (And see, Mississippi Secretary of State Articles/Certificate of Amendment showing Blanchard as a "Current Member", signed and filed by Ladner on March 20, 2017) (This document was an exhibit to the Affidavit of Ken Blanchard and to Plaintiff's memorandum of law submitted and about which Plaintiff testified and was cross-examined in open court on July 19, 2017) (See, 7/19/17 Tr. p 13/4-14).

(b)     Ladner made the above March 20, 2017 Secretary of State document filing only fourteen days after the March 6, 2017 death of Steven Ladner (Dkt 76-1 ¶ 7); only twenty-two days before Ladner made the April 12, 2017 claim on the insurance policy on Steven Ladner's life (Dkt 75-2); and only nine days before the Plaintiff filed this law suit on March 29, 2017 (Dkt 2).

 (c)     Additional prima facie evidence proved that Ladner knew or should have known that Blanchard was and is a member of the LLC beginning in 2014 and that his pleadings and other representations to the contrary were false. See, Mississippi Secretary of State Certificate of Amendment changing the name of Alamo Cooling, LLC to Alamo Mechanical, LLC; changing Ladner to "managing member"; and adding Ken Blanchard as "member", signed by Ladner and Plaintiff, dated and filed January 2, 2014. Plaintiff offered this document as an exhibit submitted with the Affidavit of Ken Blanchard, about which Blanchard testified and was cross-examined by the defense in open court on July 19, 2017) (7/19/17 Tr. p 13/4-14). Ladner himself offered this document as an exhibit in support of his various positions. (Dkt 54 p 3; Dkt 54-11);

(d)     Additional prima facie evidence of Ladner's knowledge includes the Mississippi Secretary of State 2014 Annual Report of Alamo Mechanical, LLC showing Blanchard as "Contact Member" signed and filed by Ladner on April 4, 2014. Plaintiff offered this document as an exhibit and testified and was cross-examined about it.) (7/19/17 Tr. p 13/4-14).

(e)     Additional prima facie evidence of Ladner's knowledge includes the Mississippi Secretary of State 2015 LLC Annual Report showing Blanchard as a "Member", signed and filed by Ladner on April 2,2015 (*Id.*); and Blanchard offered this document as an exhibit and testified and was cross-examined about it. *Id.*

(f)     Additional prima facie evidence of Ladner's knowledge includes the Mississippi Secretary of State 2016 LLC Annual Report showing Blanchard as a "Member" signed and filed by Ladner on April 11, 2016 (*Id.*); and Blanchard offered this document as an exhibit and testified and was cross-examined about it. *Id.*

(g)     Ladner's May 17, 2017 Answers to Plaintiff's written discovery (Dkt 50-1 to 50-3) again denied Plaintiff's membership. See, Answers to Interrogatories # 3

& 4: "...Alamo is a single member LLC"; number 6: "Keith Ladner was the sole member and manager of Alamo"; and, # 11: "...there are no other members or officers of Alamo"); Ladner's responses to production request # 8: "The company was originally set up in Texas. It is now the same company with only a name change and one owner selling his interest."; and, # 11 seeking a list of all members since 2014: "Keith Ladner"; Ladner's Answers to Request for Admissions # 1, denying that Blanchard operated Alamo; and # 2, denying that Ladner breached duties to other members: "There are no other members"; and # 4, 6 & 7, denying Ladner's duty to provide access to LLC records and reports;

(h)     Ladner submitted an opposition to Plaintiff's previous motion for access to LLC documents (Dkt 24). Ladner's opposition was submitted to the Court on July 10, 2017, but never served on Plaintiff's counsel. The motion was heard on July 19, 2017. Plaintiff's counsel learned of Ladner's ex parte submission thereafter on August 8, 2017, when he was so informed by email from Court Staff Attorney Jamie Cook. The email was described in Plaintiff's current motion for contempt and sanctions (Dkt 50) and it was made an exhibit thereto. (Dkt 50-5)

(i)     In this ex parte opposition, Ladner again denied Blanchard's membership in the LLC; he failed to attach the LLC's financial records as previously ordered; and he made representations of fact as to matters material to the motion then before the Court without reference to any evidence supporting those statements. (*Id.*)

(j)     The July 19, 2017 hearing resulted in the Court's order (Doc 41) *nunc pro tunc* to July 19, 2017, finding and concluding that Blanchard "owns a membership interest in [the] LLC"; " is a member"; and "entitled to review all ...[LLC] company records, assets and other items, without limitation, [including] a complete and comprehensive set of business and financial records with supporting documentation"]; Ladner's "previously filed [sealed items] pursuant to the Court's prior order"; and" all newly created or ongoing documents or items related to Alamo Mechanical, LLC." (Doc 41) But, while subject to this order, Ladner's February 28, 2018 supplemental responses to Plaintiff's written discovery incorporate, restate and again deny Plaintiff's membership and Ladner's duties to him, resulting from said membership. See, Ladner's Supplemental responses to interrogatories # 2; 3; 7; 9; 17; 19; and 20; production requests # 1; 9; and 10; and, request for admission # 4 (These documents were offered as Plaintiff's exhibits at the August 28-30, 2018 hearing);

(k)     Ladner repeatedly failed and refused to produce the complete company records of Alamo Mechanical, LLC, and the defense repeatedly falsely represented that he had produced them: In Ladner's February 26, 2018 opposition to Plaintiff's motion for contempt and sanctions, he represented that he had "already complied with or are in the process of completing their compliance with the Order regarding Miss Code Section 79-29-315. The Defendants have produced the bank records and QuickBooks for Alamo Mechanical, LLC." (Dkt

54 p 4) At the May 21, 2018 hearing before this Court, the defense made such representations, stating: "We produced all the current books, all the underlying data"; and "we complied, Judge. We have complied in all respects." (5/21/18 Tr. pp 14/10-11; and 20/21-22)

(l)     At Ladner's July 3, 2018 deposition, the defense again falsely represented that Ladner had complied with the discovery orders, "Let the record reflect we've produced all the records requested, several boxes, several thousand pages." (Ladner 7/3/18 Dep. p 124/14-16);

(m)     While defense counsel is responsible for his representations of fact to the Court and counsel, the Court finds that defense counsel's factual misrepresentations discussed in this order were based, in part, on false, misleading and/or incomplete information provided by Ladner to his attorneys. They do not constitute the majority of the wrongdoing in this case and Ladner is not the "blameless client" confused or lacking understanding as contemplated in *Illinois Cent. Gulf R. Co. v. McLain*, 174 So. 3d at 1285 (citations omitted). This finding addresses *McLain's* fourth factor.

(n)     In his May 2017 responses to Plaintiff's written discovery, Ladner produced unsigned, partial copies of LLC federal income tax returns for 2014-2016 in which Ladner is represented as the company's sole proprietor. (Dkt 50-12) However, at Ladner's July 3, 2018 deposition, Ladner, for the first time, disclosed that none of these returns was ever filed. The Court finds that the nondisclosure of this fact, for more than a year after these tax documents were produced in discovery, inherently misled the Plaintiff to believe that the LLC had filed the documents; and, and it violates the Court's orders to cooperate to provide all company documents.

(o) Plaintiff requested and the Court ordered that Plaintiff's forensic accountant, Donna Ingram ("Ingram") be allowed access to all company records on site. (Dkt 41) But, Ladner prevented Ingram from viewing all of the records by selecting a number of files and making only those files available on the chosen date March 2, 2018. And, defense counsel represented that Ingram had been given full access to all company records. "We produced all the current books, all the underlying data"; and "we complied, Judge. We have complied in all respects." (5/21/18 Tr. pp 14/10-11; and 20/21-22)

(p)     At deposition, Ladner disclosed for the first time that LLC tax records he produced were never filed with the IRS:

> Q. Have you paid Alamo taxes in the past five years?
> MR. WADE:   Object to the form.
> A. Alamo don't pay taxes.          (7/13/2018 Ladner Dep. p 137/3-6)

> Q. Have you submitted tax returns to us through discovery that were

unsigned? Have those been filed with the IRS?
A. No. They haven't been filed.
Q. They've not been filed?
A. I didn't submit tax returns. (*Id.* p 136/25-137/5)

Q. ... We were talking just then about taxes, and you said that Alamo
Mechanical has not paid any taxes?
MR. WADE:  Object to the form.
A. No, they pay payroll taxes.
Q. Have they paid any income taxes?
MR. WADE: Object to the form.
A. No.
Q. Have you ever filed any income tax returns for Alamo Mechanical?
A.      No.         (*Id.* p 138/13-25)

(q)     Blanchard testified, and LLC documents corroborate, that until recently,
the LLC paid the premiums on a life insurance policy on Blanchard's life. Ladner
caused the LLC to stop making these payments, but kept silent about this fact. I
find and conclude that by stopping the payments, yet failing to disclose that he did
so, Ladner intentionally violated the Court's orders not to change any party assets
and further violated the Court's orders to cooperate to produce all company
information.

(r)     One day after this Court's August 30, 2018 ruling and orders from the
bench, judicially dissolving the LLC and freezing Ladner's assets, Ladner caused
the filing of a Chapter 11 Bankruptcy Petition on behalf of the LLC on August 31,
2018. (Dkt 113-1)


23.     *As to the third McLain factor*, the Court finds that Blanchard's preparation for trial

has been substantially prejudiced by Ladner's failures to produce documents and information;

alteration of documents; concealment of the existence of some documents and alteration of

others; through the waste of nearly 2 years in stressful, frustrating and costly litigation; and

through the waste of his expert's time, for which Blanchard has already paid nearly $9,000.00.

The wasted time can never be compensated. During this wasted time, Blanchard lost all

opportunities to continue building up his business, Alamo Mechanical, LLC, during the years

that Blanchard has been shut out of it; and these too can never fully be compensated. Moreover,

had Ladner simply provided the company records in full as ordered, this matter could already

have been tried to completion. Thus, Ladner has wasted the Court's time in various discovery-related hearings and future irreplaceable time will be lost because this matter still cannot be tried until Ladner produces the balance of the LLC's records and information.

24.     Our Supreme Court has held that "substantial prejudice is not required for [the most severe sanctions] to be the appropriate remedy." *Illinois Cent. Gulf R. Co. v. McLain*, 174 So. 3d. at 1286 (citations omitted). "[S]ubstantial prejudice occurs when the discovery violations impose on the opposing party major inconvenience in time, attorney fees [sic] and general frustration." *Id.*

25.     The Defense misrepresented facts to this court by stating inconsistent positions to fit whatever works in the moment. Not the least of which are representations that Ladner owns the Steven Ladner policy, followed eventually by representations that Ladner sold it to a third party; but Ladner did not present credible admissible documentation to carry his burden of proof of this sale.  The alleged purchaser did not testify or provide an affidavit, and no bank records or canceled checks were introduced as evidence of the sale.  For this reason, Ladner's testimony and evidence on that issue are not credible and his contradictory, untimely and self-serving representations on that issue merit the most severe sanctions.

26.     Despite the 9/12/17 order, Ladner refused to provide on-site access to company records for five more months, until March 2, 2018. On that date, Plaintiff's forensic accounting expert, Donna Ingram, was allowed less than one-half of one day to review files that Ladner's employees selected and moved out of their normal storage and onto a conference table (6/21/2018 Tr. p 12/8-20).

27.     Ingram arrived at the LLC office at 11:00 a.m. (6/21/2018 Tr. p 12/8); and, she left at 2:45 p.m. (*Id.* p 14/16) Ladner, through his attorney, refused to allow access to many

documents and Ingram was never permitted to view company documents as they were normally kept on site.

28.    In addition to preventing access to certain documents, Ladner prevented Ms. Ingram from asking LLC employee, April Harris ("Harris"), questions about the documents, thereby preventing Ingram from obtaining answers needed to gain an understanding of the filing system and notations on the files. Counsel did this by imposing "instructions" and limitations during the on-site document review, in direct violation of the Court's order to "cooperate".

29.    Ingram testified about the March 2, 2018 on site document review at the June 21, 2018 hearing:

> I did ask to get an understanding of the files there. Mr. Wade allowed me to ask a few questions of April so that I could get that understanding of what documents were in the file, but he made it clear to me that I had to have limited -- it wasn't a deposition is what he said in that I needed to limit my questions to just information only. So that's what I did.    (6/21/18 Tr. p 14/3-10)

> I noted that there were some files that had an asterisk beside them, and when I asked April what that asterisk meant, the response was, "It means something to me." But that was the extent of the explanation that I received.    (*Id*. p 15/2-6)

> Q. Did she explain to you why she was not answering?
> A. She did not. But the instructions were early on when I first arrived is that Mr. Wade would be present for all questions and that he would need to approve the discussion that we had prior to April communicating anything with me.
> Q. Did you ask Mr. Wade about the asterisks?
> A. I did not at that time. When her response was, "It means something to me," I left it at that, sir.    (*Id*. pp 15/16 - 16/1)

> Q. So you never did find out what the asterisks means, even though they're notations on the file?
> A. That is correct. It was not on the file, it was on the inventory of the files that were on the table in that conference room.    (*Id*. p 16/8-13)

30.    After Ingram's testimony, the Court again ordered Ladner to cooperate and to produce all company records. By the time of the following May 21, 2018 ruling from the bench, Plaintiff had been seeking the records for more than a year:

"THE COURT: I've been through this before. I've been through it before, and it was sixty boxes. Okay. So the choice is you stand there together and scan the documents while you watch each other do it. I mean you can haul in a copier or scanner to do that. You either do that, or agree for the other party to take it and go scan it and bring it back. And if not, you stand there together and you do it. Because these are originals, and they're not copied. They're not copied at this point. So like I said, I've been through this problem. So that's the only solution. And you have to just split the cost because, honestly, good recordkeeping would require that you have the originals copied or scanned somehow in some fashion." (Tr. 6/21/2018 p 31)

31.    Beginning on May 23, 2017, Plaintiff's counsel wrote to defense counsel about the inadequacy of Defendants' discovery and repeatedly requesting compliance and full discovery. (Dkt 50-4) (Medley letters dated 5/23/2017; 1/30/2018; 2/9/2018; 2/13/2018) After filing Plaintiff's motion for contempt and sanctions (Dkt 50), Plaintiff's counsel sent additional letters seeking documents which remain outstanding. (See, August 14, 2018 letter to defense counsel with list of items; and August 20, 2018 response from defense counsel offered as exhibits at the August 28-30, 2018 hearing).

32.    More than a year later, at the June 21, 2018 hearing, defense counsel cross-examined Ingram, and, in the process, the defense represented, as fact, that "100%" of the vendor files were being produced on that date:

A. (Ms. Ingram) I received files, I believe it was Friday, but I have not looked at the content of those.

Q. (Wade) Okay. I would represent to you that those were the files or copies of the files that were on the table. Okay?

A. All hundred percent or just what was initially digitized?

A. (Wade) That's supposed to be one hundred percent as we speak. (6/21/18    Tr. pp 19/21 - 20/4)

Wade: I represent to you, Ms. Ingram, that there were six, but they were consolidated into five boxes because some of them were in hanging folders so they took them out of the hanging folders. My understanding is there are five boxes available today. Are you going to need to look at those to be able to offer any other findings of fact with regard to this printout that you provided to Mr.

Medley today?

> A. To do a comprehensive forensic review, I'm going to need the filed tax returns. I'm going to need the vendor files, the credit card statements, the -- there's a file apparently with receipts from the credit cards, there were payroll records that were not in those job files. So to do the forensic review that I have been asked to do, I will need more than just those vendor files.   (*Id.* p 21/25 - 22/16)

33.     As shown above, Ladner did not disclose until his July 13, 2018 deposition that no taxes had ever been filed on behalf of the LLC; and the Court finds that this fact should also have been disclosed by Ladner and his counsel in response to Ingram's June 21, 2018 testimony quoted above.

34.     At the prior hearing, held on May 21, 2018, the Defense emphasized repeatedly that there were sixteen boxes of documents ready to be produced - not five or even six boxes: "[W]e have sixteen boxes apparently of underlying tinder files" (5/21/18 Tr p 14/20-22); "there's approximately sixteen banker boxes full of all kinds of receipts or they're vendor files that are in different forms that add curbin (sic) and things like this" (*id.* p 19/24 -20/3); "she has had complete access to it, and she did not want to go through those sixteen boxes that day (*id.* p 20/9-11); "Not the customer files, Judge. We got those now scanned in. But on the vendor files, also there's like sixteen banker boxes" (*id.* p 27/8-11); "she didn't want to look at all those vendor files because there's like sixteen boxes of those" (*id.* p 28/16-19). "We're sitting on numerous documents the forensic accountant has went through, and she got a copy of all the current QuickBooks right after the last hearing. I spent most of the day out there with her. And we have sixteen boxes apparently of underlying tinder files that we can't seem to reach an agreement on, so we made a motion for protective order on that." (5/21/18 Tr. p 14/16-24) "I spent the day there at Alamo's office with her. She had complete access to all the underlying data for the QuickBooks. And I have photos on my phone showing an entire conference table spread out with

Ms. Ingram in front of it. She had every opportunity, went through every folder, and we told her -- we gave her copies of the QuickBooks. We didn't have all those client customer folders scanned in, and that's the only reason she didn't leave with the disk that day on those." (5/21/18 Tr. p 19/12-22)

35.    The Court does not find defense counsel's above-quoted contradictory representations to be credible. The Court further finds that the discrepancy between representations of the existence of sixteen boxes, later represented to be six, reduced to five boxes of company documents was not resolved at the August 28-30 hearing; and, further, that Ladner intentionally and willfully failed and refused to produce a significant amount of company records in this case and he attempted to conceal this fact by limiting Ingram's access to LLC records on site.

36.    Our Supreme Court instructs:

> A willful violation of a discovery rule occurs when there is a conscious or intentional failure to comply with the rule's requirements. A finding of willfulness may be based upon either a willful, intentional, and bad faith attempt to conceal evidence or a gross indifference to discovery obligations. While the severest of sanctions should be reserved for extreme circumstances, the [] court does not abuse its discretion by imposing the sanction of dismissal when a party demonstrates flagrant bad faith and callous disregard for its responsibilities.

*Pierce v. Heritage Properties, Inc*., 688 So. 2d 1385, 1390 (Miss. 1997) (citation omitted).

37.    In *Pierce*, *supra*, our Supreme Court held that the most severe sanction was appropriate because the party had lied under oath about the existence of an eyewitness. "Because there is substantial evidence in the record to support her admitted deception, the trial court's dismissal seems wholly appropriate." *Id*., 688 So. 2d at 1391. The Court explained:

> The other sanctions considered by the court would not achieve the deterrent value of the dismissal. Since any other sanction beside dismissal would virtually allow the plaintiff to get away with lying under oath without a meaningful penalty, the trial court's decision regarding this factor was correct.

*Id.*

38.    As in *Pierce*, *supra*, the Court finds that lesser sanctions in this case would not achieve the desired "deterrent value" and would "virtually allow [Ladner] to get away with lying in his pleadings, discovery responses and elsewhere, both affirmatively and through silence.

39.    At the June 21, 2018 hearing, the Defense objected to Plaintiff's motion for contempt and sanctions on the basis of surprise, because Plaintiff's counsel did not forecast his strategy to their satisfaction. They complained because they had not yet bothered to hire a forensic accountant or, apparently, any other qualified individual, to examine the LLC's records, in light of the motion's allegation that Ladner caused QB to be altered:

> MR. WADE: Part of our problem with Mr. Medley's motion for contempt, along with his pleadings, have been these vague and broad allegations. We came in here today, we've been here all day. He could have showed us these. He could have come in and said, "David, look, here's what we're going to do. We're going to say part of the contempt is you didn't produce all the records, and part of the contempt is something came off QuickBooks about changing on entries." And we're a little bit blindsided here on that, and now I've got an expert who is not testifying as an expert, testifying as a fact witness, trying to tell me, or at least telling the Court that these entries mean something, and we haven't had an opportunity to look through these things. And I guess at this point we need to hire us a forensic accountant.

(6/21/2018 Tr. pp 26/17 - 27/11)

> MR WADE: ...[H]e is trying to blindside us here with documents. (*Id.* p 28/6-7)

40.    In the above statement, the defense was complaining that Plaintiff used Ladner's own documents produced months before the hearing on the motion specifically alleging the alterations to QuickBooks. (Dkt 50, p 6)

41.    The Court finds that Plaintiff gave adequate notice of the bases of his motion for contempt, sanctions and to compel; Plaintiff was not required to share his exhibits and other evidence in advance of the hearing on that motion; and, it was and continues to be Ladner's duty

to ensure that he complies with the Court's orders, to avoid being held in contempt of court.

42.     On November 8, 2017 Plaintiff subpoenaed insurance policy records from Southern Farm Bureau Life Insurance Company (Dkt. 44) and Defendant moved to quash it on November 16, 2017 (Dkt 45) stating as follows:

> Defendant, Keith J. Ladner would further show that he is personally the owner and beneficiary of a policy on the life of Steven Ladner, as previously disclosed, and that policy is likewise wholly irrelevant to this cause and contains confidential and privileged personal financial matter. (Dkt 45 ¶ 2) (emphasis added)

43.     On March 9, 2018, one week after Ingram's March 2, 208 on-site document review, Ladner filed his initial declaratory judgment motion stating:

> "Movant, Keith J. Ladner, claims that at all times relevant hereto, he was the sole Owner of the Policy and sole Beneficiary of the Policy" (Dkt 59 p 2)

44.     At the conclusion of the hearing on the above motion for declaratory judgment as to the policy on the life of Steven Ladner, the Court made clear that it was denying that motion and ordering Ladner to post a $1.75 Million bond. Only at that moment did Ladner contend that he no longer owned the policy, having sold it as a "viatical settlement" with a non-party in 2016. (Transcript 5/21/2018, off the record discussion, pp 79-81)

45.     The entire transcript of the May 21, 2018 hearing is 90 pages. At no point before page 79 does Ladner offer any basis for his motion other than that Keith Ladner is the sole owner of the policy.

46.     All records pertaining to the Steven Ladner insurance policy are relevant and material to the parties' alleged verbal operating agreement; the allegations of Ladner's fraud; and of the freeze-out and they should have been produced in response to Plaintiff's written discovery and pursuant to the prior orders of this Court.

47.     The claim that Ladner sold the Steven Ladner policy (without notice and consent of the Plaintiff) does not diminish or defeat Blanchard's claims for damages measured, in part, by Blanchard's ownership interest in the proceeds.

48.     No credible evidence having been offered to the contrary, the Court finds that Ladner intentionally concealed the "viatical settlement" documents and information until confronted with the impending bond order at the end of the hearing on May 21, 2018.

49.     Ladner's silences in the face of his duty to speak up, disclose and clarify, on this and other issues described in this order, are just as misleading as outright lies. Our discovery rules provide that "an evasive or incomplete answer is to be treated as a failure to answer." M.R.C.P. 37. "Silence, in order for there to be liability for nondisclosure, must relate to material fact or matter known to the party [] which it is his legal duty to communicate to the other [] party." *Guastella v. Wardell*, 198 So. 2d 227, 230 (Miss. 1967). "With knowledge of these material facts" the party is "under a duty to disclose this information. Yet he remained silent. Such a case of failure to speak amounted to a suppression of material facts which should have been disclosed, and is in effect a fraud." *Welsh v. Mounger*, 883 So. 2d 46, 49 (Miss. 2004) (citing and quoting *Guastella, supra*).

50.     Ladner produced no credible, admissible evidence that he did not receive the proceeds of the policy after Steven Ladner died. Ladner's emergency motion to reconsider bond (Dkt 76) offered documents which tend to prove that in 2016 Ladner defrauded the purported purchaser of the Steven Ladner policy as well as Plaintiff, relative to the policy proceeds. The documents do not tend to prove that Ladner ever actually sold the policy. The check is made out to Ladner, not to purported buyer of policy or to the purported buyer and Ladner together. Further, Ladner could have, but did not, provide Insurance Company documents or an affidavit

stating that the policy was sold or that a non-party received the proceeds.

51.    Although the Court finds the additional pending motions moot, Ladner's emergency motion to reconsider bond is no exception to the rule of Defendant's bad faith tactics: (a) It is called an "emergency" motion, but it describes no emergency; (b) It purports to be supported by Ladner's "affidavit" attached as an unsigned and unsworn statement, which is, therefore, not admissible evidence for any purpose; (c) The unsworn, unsigned, inadmissible "affidavit" purports to authenticate its own attached "Exhibit 1" - a document entitled "Settlement Agreement" - purportedly an agreement among non-party Ladner Mechanical, LLC; non-party decedent Steven Ladner; and Defendant Ladner. (Doc 76-1). Because the affidavit is unsigned, unsworn and inadmissible, it does not serve to authenticate the "Settlement Agreement", which is also inadmissible, because it is unauthenticated. Moreover, this emergency motion claims Ladner's poverty (Doc 76), but offers no evidence to support his claim that he cannot pay the bond amount originally ordered.

52.    The banking relationship with Hancock Bank and the debt owed to that bank, per Ladner's various motions, supporting documents and Bankruptcy filing (Dkt 54-1 to 54-12; 59-1; 72; 75-77; 88-90; and 113) entitle Plaintiff to discover what other documents and information exist relative to the debt burden of the predecessor business Ladner ran in partnership with Steven Ladner, in the years leading up to the time of Steven Ladner's exit from that company and all the way through Ken Blanchard's assumption of Steven Ladner's role as Plaintiff has alleged and testified; and Plaintiff is hereby allowed to seek and obtain information and documents relevant thereto.

53.    The Court finds that Blanchard's testimony in this case has been credible and largely consistent, despite errors in his testimony as to the date on which he and Ladner first

agreed to be partners in business together.

54. Conversely, the Court finds that Ladner purposefully and willfully made false statements of fact under oath and caused his counsel to be misinformed, thereby leading both his attorneys to make false statements of fact to the Court and to Plaintiff's counsel. Ladner additionally withheld documents to which Plaintiff is entitled as a member and is entitled as a litigant in discovery. Ladner also altered documents or caused them to be altered; a fact which he concealed since at least March 2017, the date of filing of the the complaint in this matter.

55. As in *McLain*, *supra*, the Court finds that, while "[e]ach act of misconduct, taken separately, may not warrant dismissal ... given that the record before us clearly establishes ... [Ladner's] misconduct and that his misconduct includes perjury ...which strike[s] to the heart of our judicial system and require[s] sanctions to deter others" the most severe sanctions are appropriate in this case. *McLain*, at 1287.

56. Ladner's evidence, previously filed in support of his May 29, 2018 Renewed Motion for Declaratory Judgment (Dkt 75), includes the May 25, 2018 affidavit of Southern Farm Bureau Life Insurance Company, by Donna Kettleman, as custodian of records (Dkt 75-2). Ms. Kettleman's sworn testimony in this affidavit is credible, relevant and material to this matter, and on the basis of this affidavit, the Court finds that:

> (a) Defendant, Keith Ladner, individually, was listed on policy documents as the primary beneficiary and owner of a term life insurance policy on the life of Steven Ladner (no relation to Defendant Ladner). This is corroborated in the life insurance policy filed by Ladner as an Exhibit in support of his various positions on February 26, 2018 (Dkt 54-5); on March 9, 2018 (Dkt 59-1);

> (b) Keith Ladner made a claim on this policy following the death of Steven Alexander Ladner; and,

> (c) the policy proceeds were paid to Keith Ladner by way of a check dated April 12, 2017 in the amount of $1,756,472.60; and the cancelled check provided by the insurance company shows that it posted on April 27, 2017.

57.     Ladner admitted that he received and endorsed two checks from Southern Farm Bureau Life Insurance Company relative to this policy. The first check was in the amount of $242,357.00 for an accelerated death benefit paid to Ladner in 2016. The second was in the amount of $1,756,472.60 payable to Ladner, which posted on April 27 2017 after the death of the insured and after this litigation was begun.

58.     Ladner testified at the August 2018 hearing; in a previous affidavit (Dkt 76-1); and he alleged in related motions (Dkt 76 at III; Dkt 89 p 4), that he sold the Steven Ladner life insurance policy proceeds for $500,000.00 to non-party Scott Favre prior to the death of the insured because Hancock Bank demanded payment of Steven's and Keith Ladner's business debt for Ladner Mechanical, LLC.

59.     Ladner presented no evidence to support his claim that Hancock Bank called in its loan or that there was, in fact, any outstanding debt remaining from Ladner Mechanical, LLC, with Hancock Bank or any other bank or entity. The defense offered only Ladner's self-serving testimony to that effect and I do not find Ladner's testimony to be credible.

60.     The defense claimed that after Ladner sold the policy, the insurance company paid Ladner an accelerated death benefit by way of a check in the amount of $242,357.00, which he "endorsed and delivered" to Mr. Favre. (Dkt 76-1, p 2; 5/21/2018 Tr. pp 79-91)

61.     Ladner did not produce Mr. Favre to testify nor did he offer an affidavit of Mr. Favre stating, under oath, that Mr. Favre purchased the Steven Ladner life insurance policy; there is no canceled check from the life insurance company made payable to Scott Favre; and Ladner presented no receipt, proof of transfer, assignment or any other underlying paperwork to establish any payment was made to Scott Favre relative to the insurance policy on the life of

Steven Ladner.

62.    Ladner admitted that no written agreement exists documenting the claimed sale by Ladner to Scott Favre of the extremely valuable insurance policy on the life of Steven Ladner. Ladner would have the Court believe that he paid Scott Favre $1 Million in cash after endorsing the Southern Farm Bureau Life Insurance Company check made payable to himself. Again, I do not find Ladner's testimony to be credible.

63.    Blanchard previously testified that, several years ago, Ladner reported to Blanchard that debts remained from Ladner Mechanical that were subsumed by Alamo Cooling, but he did not testify that he had seen documentation of these debts. And, the defense did not present evidence of underlying documentation of any such debts, to support Ladner's claim that some or all of this debt was the reason for the accelerated death benefit paid to Ladner in 2016.

64.    Supporting documentary evidence of the company debt could easily have been obtained and presented to the Court - if such evidence exists.

65.    Blanchard began bringing to the Court's attention, by way of his July 9, 2017 affidavit, the issue of what he called "key man" life insurance policies owned by the LLC. In that affidavit, Blanchard claimed that Ladner had taken the proceeds from the Steven Ladner policy.

66.    The Court issued two restraining orders in the spring of 2017, April and May. (Dkt 4, 23) Plaintiff's forensic accounting expert witness, Donna Ingram, testified in June 2018 and again at the August 2018 hearing, that shortly after those orders were entered, beginning on or about June 7, 2017, the QuickBooks records belonging to Alamo Mechanical, LLC ("the LLC") were intentionally changed. (6/21/2018 Tr. pp 2-5)

67.    Ladner corroborates that they were intentionally changed, to reflect that the insurance premiums paid by the LLC were instead draws to Member One, Keith Ladner, and that

Member Two, Ken Blanchard's draws were reclassified as expenses. All of this occurred despite the fact that the Court had two restraining orders in place prohibiting disposal of the LLC assets and requiring production of a complete and comprehensive set of business and financial records with all supporting documentation.

68.    Ladner caused these records to be changed beginning in June of 2017. Ladner never disclosed that these records had been changed and, he delayed in producing them until September of 2017.

69.    From these facts, the Court draws the reasonable inference that Ladner caused company records to be changed in a purposeful attempt to hide the fact that the LLC was paying the life insurance premiums and also to reclassify those payments in order to disguise and conceal them within the company records.

70.    There was previous testimony in another hearing that these insurance premiums amounted to at least $90,000, if not more, over the years that the policy was in place.

71.    No credible evidence was presented to establish that the insurance proceeds belonged to any person or entity other than the LLC.

72.    If the policy had been intended to be a private policy on the life of Steven Ladner, then it would be reasonable to expect that the beneficiaries would have been the natural objects of Steven Ladner's affection, such as his wife, family members or perhaps his estate, but not his business partner.

73.    The Court finds and concludes that the policy was issued in order to address the business that Steven Ladner had with Ladner.

74.    Even if Ladner, had presented evidence to substantiate his claim that he sold some of these benefits to a third-party like Scott Favre, he would only have established that Ladner

wrongfully converted LLC assets without the knowledge of the LLC's other member, Blanchard.

75.    Ladner testified at trial that Scott Favre was the owner of the policy on the life of Steven Ladner; but his own affidavit, and the Southern Farm Bureau Insurance Company affidavit all show that the policy was titled in Ladner's name; Ladner was the named beneficiary; and no changes were made to the owner or beneficiary of this policy.

76.    Ladner is estopped from asserting that he is not the owner of the Steven Ladner life insurance policy and the beneficiary of the proceeds. He will not be permitted to present two positions that are inconsistent simultaneously, which he did in fact do under oath.

77.    Based upon the evidence presented, there is no scenario that the Court can imagine or envision that would support a finding that the Steven Ladner life insurance policy was not intended to be an LLC asset and a payoff by Steven Ladner to Keith Ladner for his position in their previous company, which was then continued through Alamo Cooling, and then continued further through Alamo Mechanical, LLC.

78.    Ladner caused the QuickBooks records to be changed in order to color these facts and to conceal company records consistent with Ken Blanchard's LLC membership status, while two restraining orders were in effect; and Keith Ladner did not disclose these changes at any time, even after entry of the third restraining order. These actions demonstrate Keith Ladner's bad faith and potentially fraudulent behavior.

79.    There is ample evidence for the Court to rely upon demonstrating that the parties, in fact, had a 50/50 business arrangement:

   (a)    There were commercial bonds for a number of LLC projects and supporting documentation establishes that Blanchard was listed as a surety on those bonds and he personally secured them with his assets.

   (b)    The LLC used Blanchard's assets, that were titled in his name;

(c)     April Harris admitted that she signed Blanchard's name on various LLC documents; and,

(d)     Blanchard testified to his version of how the company came to be in the first place, essentially that when Steven Ladner decided to abandon the business, Ladner went to Blanchard's home, and in the presence of his wife, Casey, Ladner asked Blanchard to step into Steven's place in the company, run operations and be Ladner's 50/50 partner; and Blanchard agreed.

80.     Many LLC documents either do not exist or were not produced, but the LLC documents that have been produced show Blanchard as a member of the LLC, and the Court has already found that he is a member. (Dkt 41)

81.     As of the conclusion of the hearing on August 30, 2018, Ladner, is in violation of the Court's three restraining orders and he has yet to comply with the order to provide all of the LLC's business records.

82.     The testimony explaining Ladner's delays in producing documents, given by LLC employee, April Harris, and by Ladner, are not credible and are unacceptable to this Court. It is clear to the Court that Ladner was in no hurry to comply with the Court's orders; that he was attempting to obstruct the discovery process; and that he did, in fact, intentionally delay the production of the complete records, for a year-and-a-half after the Court issued its first order.

83.     Ladner's actions violated the Court's orders and also violated discovery Rule 37 of the Mississippi Rules of Civil Procedure.

84.     Defense counsel also violated the Court's orders and Rules 11, 34 and 37 by engaging in systematic and purposeful disruption of Ladner's deposition. In the 150-page transcript, defense counsel objected 242 times, most of which were utterly improper. (7/13/2018 Ladner Dep.)

85.     "An attorney representing a deponent or a party may object to questions asked a witness, provided the objections do not disrupt the deposition. Disruptive objections are those

that unduly prolong or unfairly frustrate a deposition, such as objections that are lengthy, involve colloquy, or suggest how the deponent should respond to a question." *Jadwin v. Cty. of Kern,* 1:07CV0026OWWTAG, 2008 WL 2064514, at *1 (E.D. Cal. May 13, 2008). See also, *Mississippi Farm Bureau Mut. Ins. Co. v. Parker*, 921 So. 2d 260  (Miss. 2005). "What we are witnessing more and more ... amounts to nothing more than "Rambo-type" tactics[.] Lawyers need to remember that while they are compelled under their oaths to be zealous advocates for their clients, they also owe an absolute duty, as officers of the court, to adhere to moral standards of fundamental decency, and to aid the trial courts to bring about fair and expeditious resolutions of the pending cases [.] ... [W]e will not hesitate to do that which we are instructing our trial judges to do-rein-in this contentiousness which exists amongst our litigants and their lawyers." Id., 921 So. 2d at 265-266.

86.     The discovery abuse at Ladner's deposition merits, a second Ladner deposition to be taken at Plaintiff's convenience, at Ladner's expense.

87.     On the basis of Ladner's violations of the Court's orders and Rule 37; the obstructionist tactics used by defense counsel at deposition; and, all of the various acts enumerated above, the Court finds and concludes that Ladner has violated every pertinent provision of Rule 37, and he acted in willful and contumacious contempt of all three of the Court's restraining orders, as well as the rulings and orders delivered from the bench on August 30, 2018; and no lesser sanctions will suffice to deter Ladner and future litigants from engaging in similar behavior, than the sanctions entered herein.

IT IS, THERERFORE, ORDERED AND ADJUDGED as follows, *nunc pro tunc* August 30, 2018:

i.      The deposition of Keith Ladner shall be retaken at his own expense.

ii.     Based upon the authorities cited herein, the Court accordingly strikes Ladner's answer to the complaint and answer to the petition (Dkt 17 and 18) and all Ladner pleadings.

iii.     The Court grants default judgment against Ladner, individually, in favor of Blanchard, on issues of liability, and finds and concludes that he is a 50 percent member of Alamo Mechanical, LLC based upon the evidence presented to the Court through testimony and the supporting documents described herein.

iv.     The Court will assess the amount of monetary sanctions for contempt and Rule 37 violations to include attorney's fees, expert fees and costs, as well as the amount of damages to the plaintiff at a later hearing. At that time the Court will determine the nature and value of assets of the LLC.

v.     The LLC is hereby dissolved judicially, however, the Court's prior restraining orders remain in full force and effect regarding all records of the LLC; and all LLC assets, regardless of title or possession.

vi.     All assets of Alamo Mechanical, LLC and of Keith Ladner, individually, are frozen until a bond is entered in the amount of one million dollars ($1,000,000.00). The amount of such bond is subject to being increased, depending upon the Court's future findings as to assets and their valuation.

vii.     The Court will conduct a hearing to determine the assets of the LLC and damages to be awarded. It is, therefore, unnecessary to consider the defendant's motions for declaratory judgment and to reconsider bond and those motions are rendered moot by the above findings, conclusions and order.

viii.    This order is effective *nunc pro tunc* to the time of the Court's bench ruling on

August 30, 2018,

SO ORDERED AND ADJUDGED on this 6th day of September, 2018.

_____
CHANCELLOR

Copies to:

Donald W. Medley, Esq.
Attorney for the Plaintiff

F. Douglas Montague, III, Esq.
David R. Wade, Esq.
Attorneys for the Defendants